Argued and submitted August 6, 2009, affirmed December 15, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## SAMUEL ADAM LAWSON,
*Defendant-Appellant.*

Douglas County Circuit Court
03CR1469FE; A132640

244 P3d 860

Daniel J. Casey argued the cause and filed the briefs for appellant.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Gregory A. Rios, Assistant Attorney General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

BREWER, C. J.

Sercombe, J., dissenting.

---

* Brewer, C. J., *vice* Edmonds, S. J.

**BREWER, C. J.**

Defendant, who was convicted of five counts of aggravated murder, ORS 163.095; three counts of attempted aggravated murder, ORS 161.405; and two counts of first-degree robbery, ORS 164.415; raises numerous challenges to his convictions. First, defendant argues that the trial court erred in denying his motion to strike the surviving victim's in-court identification of him as the perpetrator of the crimes on the ground that the victim's identification had been tainted by suggestive police procedures. Defendant further argues that the trial court erred in denying his motion for production of documents concerning other shootings, as well as in excluding as irrelevant certain evidence that defendant proffered concerning other shootings. Defendant next argues that the trial court erred in admitting expert testimony concerning a bloody footprint found at the crime scene. Finally, defendant raises several challenges concerning alleged juror misconduct and problems with jury deliberations. We write to discuss only defendant's arguments concerning the victim's in-court identification of him. We reject defendant's remaining arguments without discussion. For the reasons set forth below, we affirm.

Because defendant was convicted, we provide an overview of the facts—other than the facts relating to the victim's in-court identification of defendant as the perpetrator of the crimes, which will be discussed separately—in the light most favorable to the state. *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008).

The victims, Noris and Sherl Hilde, went camping in the Umpqua National Forest at a location called Briggs Camp, arriving on the day of August 21, 2003, at a campsite where Noris had earlier set up a tent. When they arrived with their truck and trailer at the campsite, they found that defendant had moved into their tent. Nobody else was at Briggs Camp. Noris told defendant that the campsite and tent were theirs; defendant explained that he thought the tent had been abandoned, then gathered items from the tent, put them in his truck, and moved to another campsite near the Hilde's campsite. Shortly thereafter, defendant left that campsite in his truck. Sherl (the surviving victim), described

the encounter in detail, as well as describing defendant and his truck. Defendant's account of what occurred when he encountered the Hildes on the day of August 21, 2003, was consistent with Sherl's description of what occurred.

At approximately 10:00 p.m. that evening, while Sherl was in their trailer at the campsite, she was shot in the chest from outside the trailer while she was closing a window. Sherl was unable to move her legs, but retained consciousness. Noris turned out the lights in the trailer in order to make it more difficult for the shooter to see them, but turned the lights back on again to locate and then to dial Sherl's cell phone to call 9-1-1.[1] Noris told the 9-1-1 operator that Sherl had been shot, that he believed poachers had shot her, and that he had heard someone drive away. He described their location to the 9-1-1 operator. While he was on the phone with the operator, Noris also was shot and fell to the ground just outside the trailer. He died shortly thereafter.

Sherl heard someone approach the trailer. A man came to the door of the trailer and demanded the keys to their truck. Sherl told him various possible locations where the keys might be found. She heard him searching for the keys, after which he returned and said he could not find them. Sherl asked the intruder if he intended to kill them, and he asked if she had seen his face. She responded that she had not. He then grabbed a cushion off a chair and put it over her face. Sherl slowly turned her head and was able to see the man briefly as he was leaving. Shortly thereafter, the cell phone near Sherl rang, and she was able to answer it. It was the 9-1-1 operator, calling the number that Noris had given during the earlier call.

Sherl told the operator that both she and Noris had been shot and confirmed their location. Emergency personnel arrived while Sherl was on the phone with the operator. The bullet had critically injured Sherl; she remained hospitalized for more than a month after the shooting and spent several months in a rehabilitation facility thereafter.

---

[1] Sherl's testimony was somewhat unclear as to whether Noris turned the lights back off after dialing 9-1-1. In any event, when emergency personnel arrived, they found the trailer to be either unlit or dimly lit.

Based on information that Sherl provided to investigators, as described in more detail below, the investigation of the crimes soon focused on defendant. Sherl had mentioned a yellow truck, and defendant's yellow truck had been ticketed in a parking lot near the crime scene several days earlier. Several days before the crimes were committed, defendant's parents had returned home from an extended trip and discovered that one of defendant's father's rifles, a .357 Marlin, was missing from his gun case. Defendant, who had been living at his parents' home, was missing as well. After learning that there had been a shooting, defendant's parents contacted authorities about defendant and the missing gun, apparently concerned that he may have committed suicide.

Defendant was later located with another relative and interviewed by the police. He admitted that he had taken his father's rifle and ammunition and that he had been camping in the area where the crimes occurred. He asserted that he had slept in the woods one evening shortly before the shooting, and when he returned to his truck the following day, he discovered that the rifle had been stolen from his truck. Thereafter, he went to Briggs Camp and discovered the Hilde tent, which he believed had been abandoned. He moved into the tent, because he had not brought one with him. As noted, his account of what occurred when the Hildes arrived at Briggs Camp was similar to Sherl's account. He asserted, however, that he had not returned to Briggs Camp after he had left that day, but spent the night in his truck in a different area.

The police observed an injury on one of defendant's hands that they believed was consistent with an injury that could have been caused by ejecting a shell casing from a rifle. During the interview, defendant denied committing the crimes against the Hildes. When told that the female victim had survived, defendant expressed disbelief that she had survived.

Other evidence at trial included expert testimony indicating that the bullet fragments recovered from the victim's bodies could have come from the .357 Marlin rifle and

that a bloody shoe-print found at the crime scene was consistent with defendant's footwear.[2]

As noted, the issue before us on appeal concerns Sherl's in-court identification of defendant as the perpetrator of the crimes. Accordingly, we describe the evidence pertinent to the legal analysis of that issue in some detail. When emergency personnel arrived on the scene in response to the 9-1-1 call, an EMT asked Sherl who had shot them, and she replied, "I don't know." The EMT later asked again if she knew who did it and whether they were in a vehicle, to which Sherl replied, "I don't know. They wanted our car[, ]our truck." At trial, Sherl testified that she did not initially disclose that the man who had been at the campground earlier in the day—defendant—was the shooter because she was afraid that defendant was still there. She further testified that she continued to refuse to tell medical personnel who had shot them because of her fear of defendant.

Deputy Mapes, the first police officer to interview Sherl after the shooting, spoke with her while she was in the ambulance. He testified that she told him that the perpetrator had been wearing a black shirt and baseball cap with white letters. However, Sherl did not indicate that she had seen the perpetrator earlier in the day at the campground. She told Mapes that the perpetrator said that he was not going to kill her because she had not seen his face.

Sherl testified that, while she was being transported by ambulance, she was informed that Noris was dead. At that point, she told ambulance personnel that the shooter was the man who had been in the campground earlier in the day. An ambulance attendant confirmed that Sherl had stated that the man who shot her was wearing a dark shirt and cap and that she had seen him earlier that day in the campground. When Sherl was transferred to a life-flight helicopter, she told one of the medical personnel that a young man had shot her and that he had a yellow truck. Defendant adduced evidence at trial that Sherl also made a statement to medical personnel at one point that she believed that the life-flight helicopter pilot was the man who had shot her.

---

[2] Defense experts countered the state's experts on both of those points. The details of that evidence are not pertinent to the sole issue that we resolve in this appeal.

On August 23, Sergeant Kipp of the Oregon State Police visited Sherl in the hospital and showed her a photo throwdown containing defendant's picture, but she was unable to identify defendant as the perpetrator.[3] Although she was unable to speak due to her critical medical condition, Sherl indicated in response to Kipp's leading questions that she had seen the perpetrator, that he had been wearing a baseball cap, that he had earlier been in their campsite in their tent, and that he had a yellow truck. She later explained at trial that her eyes were very watery when Kipp interviewed her, and she was on morphine, so was unable to pick out the details of the photos.[4]

Detective Merrifield interviewed Sherl at the hospital on September 3. She was still in the critical care unit, but was able to communicate briefly through whispers, although Merrifield had some difficulty understanding her. She indicated that the perpetrator had been looking for the keys, that she would have given them to him, and that he had put a pillow over her face. A hospital worker who was present during that interview testified that Sherl had indicated that it had been dark, that there had been a pillow over her face, and that Sherl was apologetic that she could not see the attacker.

On September 22, Merrifield visited Sherl in the hospital again, at which point she was able to talk, although she was very shaky due to medication. He showed her a photo throwdown, again containing defendant's picture, and Sherl again was unable to pick out defendant.[5] At trial, she testified that she could not see the photos very clearly at that time, because the pictures were too small. She did, however, identify a large photo of defendant's truck as the one that had been at the campsite earlier on the day of the shooting.[6]

---

[3] The photo throwdown contained black and white photos of defendant and five other men, shown in a frontal view and a profile view.

[4] Kipp explained in his testimony that the interview was conducted in less than ideal circumstances (quickly and using leading questions) because Sherl was about to undergo surgery and there was some doubt as to whether she would survive the surgery. Kipp was able to ask leading questions about defendant specifically, because defendant had already been interviewed and had described his encounter with the Hildes at their campsite on the day of the crimes.

[5] That photo throwdown contained color photos of defendant and five other men, shown in a frontal view and a profile view.

[6] We note that there was no evidence that defendant's truck had been present at the time of the crimes. In fact, Sherl testified that she believed that the truck

According to Merrifield's report and testimony, Sherl told him during that interview that the man who entered the trailer to demand the keys was wearing a dark shirt and baseball cap like the man who had been at their campsite earlier in the day had been wearing. Sherl asked Merrifield if the perpetrator had been apprehended, because she was afraid that he would return to kill her or her family. Merrifield assured her that they had a person in custody for the crimes.

On October 1, Merrifield returned to the hospital to interview Sherl again and was accompanied by Kipp, who had previously interviewed Sherl on August 23. Sherl expressed concern that she had not had a direct view of the person who had shot them, that she had seen only his profile, and that that would not be an identification that she could testify to in court. She added, however, that the shooter was the man who had been in the camp earlier in the day. She explained that the man had a thin build, was wearing a baseball cap, and had a dark shirt. She further told Merrifield, however, that "she didn't think she could swear it was him, because she only saw his face in profile." Kipp asked Sherl if she would be willing to look at a profile lineup, and she indicated that she did not know if she could do that. Toward the end of the interview, Merrifield told Sherl that "the man that you've identified is the person that we have in custody," and he identified defendant by name.

Later in October, Sherl was released from the hospital and transferred to a rehabilitation facility, where she stayed until December. While she was at the rehabilitation facility, a person who worked there showed her a newspaper photograph of defendant, which identified him as the person who had been arrested for the crimes.

Approximately one month before trial—and approximately two years after the crimes—Merrifield showed Sherl a single photograph of defendant that had been taken the day after the shooting. At that point, she identified defendant as the man who had entered the trailer, put the pillow over her face, and demanded the truck keys. At around the same time,

---

was not present at the time of the crime, because she had noted earlier in the day that it was very noisy, and she did not hear it on the evening of the crime.

Merrifield also brought Sherl to the courthouse to observe defendant during a pretrial hearing.

Sherl and Merrifield also testified that, about a month before trial—after Merrifield had shown her the individual picture of defendant and she had seen defendant at the pretrial hearing—as she was working with the prosecution to prepare for trial, Sherl had inadvertently come across a photo throwdown that was among the crime scene photos, and she had spontaneously identified defendant from among the six individuals shown there.

Defendant called as a witness Dr. Daniel Reisberg, an expert in assessing the accuracy of eyewitness identification. In closing argument, defendant's attorney described in detail Reisberg's testimony as he wove that testimony into his theory of defense:

> "And I'm going to go into some detail on this, because every rule that could possibly have been broken in how you approach a purported eyewitness and to gather the evidence—and I'm going to talk a lot about Dr. Reisberg and what he presented here, because Dr. Reisberg really laid it out. I'm going to go into some detail, and I ask you to bear with me, because what he had to say here, some of it is common sense, some of it's not, but what is not common sense is built on the soundest scientific research that we have. And this isn't stuff that was just developed yesterday. This is research that's gone on over 20, 30 years, it's going on today, it's been peer reviewed, and it is so well accepted that the United States Department of Justice actually brought people in like Dr. Reisberg to * * * consult with prosecutors, police, the attorney general of the United States, to say we have to do something about these—what we know are these wrongful convictions that are based upon, more than any other factor, mistaken eyewitness ID's. Not lying, but that the way the investigations are conducted have a contaminating effect, and it's been proven so much that the United States government has recognized it.
>
> "* * * * *
>
> "* * * And I'm going to get into some of what Dr. Reisberg told you about. When you start getting feedback from * * * someone in a position of authority and someone who you

trust, there's a danger sign right there, and the feedback. * * *

"Now, Dr. Reisberg * * * [testified] that the statements made close in time after the event are what you want to look at. Not the statements that are later after there's been suggestions or leading questions or all of these other factors that can affect memory. You want to look at the statements close in time to see if they're, number one, consistent; do they make sense; are they off the wall? That's going to give you the best idea of what's going on at the time. * * *

"* * * * *

"* * * And Sergeant Kipp * * * every question he asked [Sherl] by nature of the interview had to be * * * all leading questions.

"And Dr. Reisberg said that's one of the factors that can lead to a bad ID. It's that power of suggestion, particularly when someone is in a vulnerable situation. No one could have been more vulnerable or susceptible than [Sherl] was when she was interviewed on August 23rd, when she was in that horrible state.

"* * * * *

"* * * When you're asked the same question over, when the same topic is covered over and over, it becomes more and more familiar, and you get that confidence malleability. Do you remember [Reisberg] talked about that? * * * [T]hey've scientifically proved that there's no correlation between confidence and accuracy."

Defense counsel emphasized the foregoing theme throughout his argument. At the beginning of his closing argument, counsel said:

"But this case is built on the foundation of sand. * * * And that's on this so-called identification by [Sherl]. Now, with the greatest respect for [Sherl], she is a genuine victim, an absolute, victim, and her husband, and I cannot emphasize that enough. And I * * * have never, inferred in any way that she's lying. [Sherl] doesn't know what the truth is any more. She has been so contaminated by the police in this case."

At defendant's request, and consistently with his primary theory of defense, the trial court instructed the jury as follows:

> "You have heard testimony of eyewitness identification. In deciding how much weight to give this testimony, you may take into account the various factors mentioned in these instructions concerning the credibility of witnesses. In addition to these factors, in evaluating eyewitness identification testimony, you may also take into account the capacity and opportunity of the eyewitness to observe the offender based on the length of time for observation and the condition at the time of observation; whether the identification was a product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness; any inconsistent or consistent identifications made by the eyewitness; the passage of time between the event and the identification; whether the witness had known or observed the offender at earlier times; and the totality of circumstances surrounding the eyewitness's identification."[7]

Defendant contended at trial, and reiterates his argument on appeal, that Sherl should not have been permitted to make an in-court identification of defendant as the perpetrator of the crimes because "unduly suggestive" pretrial identification procedures had been used. In particular, defendant asserts that, after several unsuccessful attempts to have Sherl identify defendant's photo in a photo throwdown, police had shown her an individual photo of defendant and had had her view defendant in person during a pretrial hearing, which had compromised her ability to make a reliable in-court identification of defendant as the perpetrator of the crimes.

In *State v. Classen*, 285 Or 221, 232, 590 P2d 1198 (1979), the Supreme Court explained the reasons, grounded in due process concerns, for excluding in-court identification of defendants by witnesses after unduly suggestive identification procedures had been used:

> "[T]he unreliability of eyewitness identification under suggestive circumstances is widely recognized, and * * * the

---

[7] Although the instruction that the trial court gave was not identical in wording to the instruction that defendant requested, it was substantively similar. Defendant does not assign error to the instruction as given.

procedures used to minimize this unreliability bear on the admissibility of evidence of such identification. As a practical matter, in the context of a motion by a defendant to suppress identification evidence on the ground that it is the product of a suggestive procedure, the decision on its admissibility involves two steps. First, the court must determine whether the process leading to the offered identification was suggestive or needlessly departed from procedures prescribed to avoid such suggestiveness. If so, then the prosecution must satisfy the court that 'the proffered identification has a source independent of the suggestive confrontation' or photographic display, *see Commonwealth v. Botelho*, 369 Mass 860, [343 NE 2d 876] (1976) (citing cases), or that other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure."

(Footnote omitted.)

■        In this case, the trial court resolved the first issue—whether the process leading to the identification was suggestive or needlessly departed from procedures prescribed to avoid suggestiveness—in defendant's favor, concluding that Merrifield's actions in showing Sherl an individual picture of defendant and having her view defendant during a pretrial hearing constituted suggestive processes. The state does not dispute on appeal that the trial court correctly concluded that those actions were unduly suggestive. We conclude that the state's concession on that issue is well-taken, and accept it.

■        The remaining question, as the court framed it in *Classen*, is whether the identification had a source independent of the suggestive identification procedures, or "other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure." *Id.* at 232; *see also State v. Davie*, 56 Or App 507, 513, 642 P2d 680, *rev den*, 293 Or 146 (1982) (framing the question as "whether under the totality of the circumstances, the identifications were nevertheless reliable and therefore admissible"). On this question, "[t]he state bore the burden of proving that the identifications were based on a source independent of the suggestive confrontation." *Id.*

The court in *Classen* identified a nonexclusive list of pertinent factors to be considered in making that determination:

> "These include the opportunity that the witness had at the time to get a clear view of the persons involved in the crime and the attention he or she gave to their identifying features, the timing and completeness of the description given by the witness after the event, the certainty expressed by the witness in that description and in making the subsequent identification, and, of course, the lapse of time between the original observation and the subsequent identification. These are not to be taken as a mechanical checklist of 'constitutional' facts. Obviously other facts may also be important, such as the age and sensory acuity of the witness, *see State v. Bush*, 29 Or App 315, 563 P2d 747 (1977), or a special occupational concern with people's appearance or physical features, or the frequency of his or her contacts with individuals sharing the general characteristics of the person identified, *see Manson v. Brathwaite*, 432 US [98, 115, 97 S Ct 2243, 53 L Ed 2d 140 (1977)]. Listing these and other relevant inquiries must not distract attention from the ultimate issue whether an identification made in a suggestive procedure has nevertheless been demonstrated to be reliable despite that suggestiveness."

*Classen*, 285 Or at 232-33 (footnote omitted).

The test set forth in *Classen* was loosely based on the test applied by the United States Supreme Court in *Manson*, 432 US at 115-16, which, in turn, had been developed in earlier cases such as *Foster v. California*, 394 US 440, 89 S Ct 1127, 22 L Ed 2d 402 (1969), and *Neil v. Biggers*, 409 US 188, 93 S Ct 375, 34 L Ed 2d 401 (1972). Those decisions, in turn, were based on an earlier trilogy of cases that the United States Supreme Court decided in 1967, where the Court recognized that the process by which a witness is given an opportunity to identify a suspect represents a "critical stage" in a criminal prosecution. *United States v. Wade*, 388 US 218, 87 S Ct 1926, 18 L Ed 2d 1149 (1967); *Gilbert v. California*, 388 US 263, 87 S Ct 1951, 18 L Ed 2d 1178 (1967); *Stovall v. Denno*, 388 US 293, 87 S Ct 1967, 18 L Ed 2d 1199 (1967). Although *Wade* and *Gilbert* involved the protection of the presence of defense counsel at this "critical stage," *Stovall* stated that evidence of a pretrial identification must be

excluded if, under "the totality of the circumstances sur-rounding it," the identification procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification" that it fell short of due process of law. 388 US at 302. For context, we briefly describe the *Foster, Biggers,* and *Manson* cases.

In *Foster*, a robbery victim viewed a lineup of three people, but two were not similar in height to the defendant and were not dressed as the robber had been dressed. The victim believed that the defendant was the robber but was unable to make a positive identification. The defendant was then brought before the witness individually, and the witness remained unsure. Finally, the defendant was brought before the victim in a lineup, but the defendant was the only person in the lineup who had been in the previous lineup. At that point, the victim identified the defendant as the robber. 394 US at 441-42. The Court concluded that the suggestive police procedures made it "all but inevitable" that the victim would identify the defendant, "whether or not he was in fact 'the man.' " *Id.* at 443.

In *Biggers*—the first case to develop a comprehensive list of the factors relevant to the inquiry—the Court stated that the following factors are pertinent to a determination of whether unduly suggestive pretrial procedures should require exclusion of an in-court identification:

> "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

409 US at 199. In that case, the victim of a rape described her attacker as "fat and flabby with smooth skin, bushy hair and a youthful voice," and further described him as "between 16 and 18 years old and between five feet ten inches and six feet tall, as weighing between 180 and 200 pounds, and as having a dark brown complexion." *Id.* at 194. Seven months after the crime, the victim was brought to the police station and the

respondent was required to walk past her and say the same words that the attacker had said during the rape. The victim asserted that she had "no doubt" that the respondent was the attacker. *Id.* at 195. In a habeas corpus proceeding, the federal district court held that the identification procedure had been unduly suggestive; the Court addressed whether, in the totality of the circumstances, "the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199. The Court concluded that it was:

> "The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough. She had 'no doubt' that respondent was the person who raped her. * * *

> "* * * * *

> "There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases. Here, however, the testimony is undisputed that the victim made no previous identification at any of the showups, lineups, or photographic showings [which had not included the respondent]. Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup. Weighing all the factors, we find no substantial likelihood of misidentification."

*Id.* at 200-01 (footnote omitted).

In *Manson*, an undercover police officer bought drugs from a man whom he described as "a colored man, approximately five feet eleven inches tall, dark complexion, black hair, short Afro style, and having high cheekbones, and of heavy build." 432 US at 101. The officer also described the man's clothing. Based on that description, another officer left a photo of the defendant on the undercover officer's desk

because he thought the description matched the defendant. The undercover officer saw the photo two days after making the drug deal and identified the defendant. Seven months later, at trial, the officer positively identified the defendant. *Id.* at 101-02. The Court, after agreeing that the photo identification procedure had been suggestive, considered five factors—those identified in the *Biggers* case—that it deemed should "be weighed [against] the corrupting effect of the suggestive identification itself." *Id.* at 114.

As to the first factor, the opportunity to view the perpetrator during the crime, the Court noted that the undercover officer was within two feet of the defendant, for two to three minutes, and "it was not dark or even dusk or twilight." *Id.* The second factor that the Court considered was the officer's degree of attention. It noted that the officer was specially trained to pay attention to detail and, being of the same race as the defendant, was "unlikely to perceive only general features[.]" *Id.* at 115. The third factor was the accuracy of the officer's description made "within minutes" of the drug deal, which included "the vendor's race, his height, his build, the color and style of his hair, and the high cheekbone facial feature," as well as clothing. *Id.* The fourth factor was the officer's certainty that the photo was that of the defendant. And the final factor was the timing: The undercover officer's "description of his vendor was given to [the second officer] within minutes of the crime. The photographic identification took place only two days later. We do not have here the passage of weeks or months between the crime and the viewing of the photograph." *Id.* at 115-16. The Court ultimately concluded that, in the totality of circumstances, there was not "a very substantial likelihood of irreparable misidentification" and, therefore, held that the identification evidence was admissible. *Id.* at 116.

The Oregon Supreme Court's application of its similar test in *Classen* involved factors that were much the same. In *Classen*, the victim hired two men to do yard work. One man, a black man, asked to use the toilet; the victim agreed and, after the man failed to return in a few minutes, she became suspicious. She entered her house and found that it

had been burglarized, and the man who had asked to use the toilet was gone; on returning outside, she found that the other man (a white man) also had left. *Classen*, 285 Or at 233. On the same day, the victim provided a description of the white man as "five feet four inches tall, slender, weighing 150 pounds, with short light brown hair and a Vandyke beard." *Id.* at 234. Seven months later, the victim was shown a photo throwdown with seven pictures; all had mustaches, but none other than defendant had a beard. After being told that the officer suspected that the perpetrator of the crime was among the seven, the victim, with some degree of hesitation, eventually selected the defendant's photo. *Id.* at 234-35.

After setting out the test described above, the court concluded that the victim should not have been permitted to make the in-court identification. First, the court noted that the victim's opportunity to view the defendant, "in daylight, under conditions when she would give her attention to [him], and without distracting elements of fear or stress," weighed in favor of admission of the evidence. *Id.* at 236-37. The court noted, however, that the obverse might be true in some cases, where "the stress of confrontation with a criminal has been cited as making for a high degree of attention and impressing the defendant's picture on the victim's memory." *Id.* at 237 n 11. On the other hand, the court noted, the photo throwdown did not occur for seven months after she had seen the defendant, "her identification of [the] defendant's photograph at that time cannot be described as very positive," and, by her own description "at the time I just didn't pay that much attention." *Id.* at 237. Given those weaknesses, the court concluded that "the state ha[d] not carried [its] burden." *Id.* at 238.[8]

---

[8] On numerous occasions since *Classen* was decided, as the state notes, we have upheld in-court identifications that followed overly suggestive police procedures, concluding that the identifications had suitably reliable independent sources. *See, e.g., State v. Ray*, 157 Or App 601, 971 P2d 490 (1998) (assuming that show-up was unduly suggestive, the court concluded that identification had an independent source because the witness had seen the defendant many times over the course of three years, immediately knew who he was, and had ample opportunity to view him at the time of the crime); *State v. Najibi*, 150 Or App 194, 199, 945 P2d 1093 (1997), *rev den*, 326 Or 464 (1998) (despite overly suggestive photo identification procedures, witnesses' identifications of the defendant had sufficient independent source, where witnesses paid "close attention" to identifying features,

■    In the present case, the trial court noted that Sherl had had a significant opportunity to observe defendant in the campground on the day of the crime and had noted his demeanor, his "loping" walk, and that he was wearing a dark shirt and black cap with white lettering. The trial court then made the following findings and conclusions concerning the second portion of the *Classen* test:

"2.      * * *

"* * * * *

"b.    * * * It is the opinion of the court that Ms. Hilde's in-court identification of the defendant is based on her personal observations of the defendant on August 21, 2003. Ms. Hilde had a significant period of time to observe the defendant during the initial contact, and she took note of his features and demeanor. Later, after the shootings, Ms. Hilde saw the defendant's profile from a relatively short distance, observed his attire and heard his voice. She is certain that the 'man' that

and provided "immediately after" the crime a "detailed description of the man's height, weight, skin color, eye color, hair color, hair and clothing"); *State v. Mackey*, 86 Or App 691, 740 P2d 231, *rev den*, 304 Or 279 (1987) (although show-up procedure used shortly after a crime was overly suggestive, witness's identification was independently reliable because she had had an opportunity to examine the defendant's unmasked face, had noted a scar over an eye and a tattoo, had described the type and color of clothing he was wearing, and had described his hair color and beard); *State v. Morgan*, 80 Or App 747, 724 P2d 334, *rev den*, 302 Or 461 (1986) (assuming show-up shortly after crime was unduly suggestive, witness identification had independent, reliable source, where she had had a good opportunity to observe him during the crime, struggling with him for about one minute in a well-lighted area, and provided an accurate description of him immediately after the crime); *State v. Goldsby*, 59 Or App 66, 650 P2d 952 (1982) (assuming that show-up procedures shortly after crime were unduly suggestive, witness identification was sufficiently independently reliable, where she was able to observe the defendant's face for "a good minute" during the crime and provided a detailed, accurate description of him within minutes thereafter); *Davie* (identification was sufficiently reliable despite suggestive identification procedure, where one witness, although unable to see facial features, observed physical characteristics and provided detailed description of clothing, and second witness who gave the same description saw the defendant in close proximity in a lighted area and was able to independently give police a similar detailed description several hours after the crime; lack of ability to describe facial features was not dispositive because description of other characteristics were "detailed"); *State v. Robertson*, 42 Or App 471, 600 P2d 935 (1979) (witness identification had sufficient independent source despite suggestive show-up, given that she had described the race of the suspects and their builds, and gave a detailed description of clothing and ski mask worn, and a general description of their car, shortly after the crime).

was in their camp site on the morning of August 21, 2003, is the same 'man' that shot her husband and herself later that evening.

"c.   * * * Given the finding that Ms. Hilde's in-court identification of the defendant is based on her personal observations, the reliability and probative value of the identification under the circumstances is a question for the jury."

We are bound by the trial court's findings of historical fact on this issue. *State v. Najibi*, 150 Or App 194, 197-98, 945 P2d 1093 (1997), *rev den*, 326 Or 464 (1998); *Davie*, 56 Or App at 513. We are not, however, bound by the conclusions that the trial court drew from the facts, if those facts do not support the conclusions. *Najibi*, 150 Or App at 198; *Davie*, 56 Or App at 513.

The first factor identified in *Classen* is "the opportunity that the witness had at the time to get a clear view of the persons involved in the crime." *Classen*, 285 Or at 232. The focus of that inquiry is on Sherl's opportunity to perceive the man who came to the trailer after she had been shot, which occurred "at the time" of the crime. As pertinent to the first factor, the trial court found that Sherl "saw the defendant's profile from a relatively short distance, observed his attire and heard his voice." Those findings are supported by the record. But as defendant notes, several other facts are pertinent here, as well: The observation occurred some time after 10:00 p.m. in a trailer that either was unlit or was dimly lit; the observation was brief; Sherl was observing the man covertly, because he had put a pillow over her face to prevent her from seeing him; she saw him only in profile; at the time she saw him, she was suffering from a painful and indeed life-threatening gunshot wound.

As the cases we have cited demonstrate, some of these facts could support an inference either in support of, or against, the strength of the identification. As noted in *Classen*, "fear or stress" (which undoubtedly were present in these circumstances) might be classified as "distracting elements" or might "mak[e] for a high degree of attention and impressing the defendant's picture on the victim's memory."

285 Or at 237 n 11. Given Sherl's testimony that she deliberately and surreptitiously moved her head in order to see the perpetrator, we conclude that her glance at him, although fleeting, was not the sort of casual observation of which the court was dismissive in *Classen*. Thus, although Sherl viewed the perpetrator only briefly, and in circumstances that certainly were not optimal for viewing, we conclude that at least certain aspects of this factor weigh in favor of a conclusion that Sherl's identification was independently reliable.

The second factor concerns "the timing and completeness of the description given by the witness after the event." *Id.* at 232-33. Sherl's ability to provide a description of the events that occurred, or of the perpetrator, was compromised by a life-threatening injury that left her in severe pain and with limited ability to communicate for a long period of time after the crimes occurred. We reiterate the evidence concerning how she described the perpetrator after the crimes: When the first responders arrived at the scene, Sherl told them, in response to questions, that she didn't know who had shot them. However, she told an officer at the scene that the perpetrator had been wearing a black shirt and a baseball cap with white letters. She repeated the description of the shirt and cap while in the ambulance, and further indicated that the perpetrator had been a young man whom she had seen earlier in the day. At some point on the way to the hospital or shortly after she arrived, she also indicated a belief that the helicopter pilot was the perpetrator.

When interviewed two days after the shooting, Sherl stated that the perpetrator had worn a baseball cap and had been at their campsite earlier in the day. In an interview approximately two weeks after the shooting, Sherl indicated that it had been dark and was apologetic that she couldn't see the perpetrator, but in an interview several weeks after that, she again mentioned the dark shirt and the baseball cap and that the man had been at the campsite earlier on the day of the shooting.

In her interview with police on October 1, Sherl reiterated the description of the shirt and cap and her belief that

it had been the same man who had been at the campsite earlier in the day. Although she expressed concerns about her ability to identify him because she had only seen his profile, she did not express doubts as to who the perpetrator was. As noted, after that point, Sherl learned that the person she had seen earlier that day in the campsite (defendant) had been arrested, and on various occasions, she saw either defendant or his picture in circumstances where she was aware that he was the person who had been arrested for the crimes.

To summarize, the evidence concerning timing and completeness of the description given by Sherl in the days and weeks after the crimes was somewhat sketchy, due to Sherl's extremely serious physical injuries. Her description of the perpetrator's shirt and cap was consistent, if not highly detailed. There were some inconsistencies in what she said. Moreover, none of those descriptions was of specific features, such as eye color, hair color, or distinguishing characteristics. Nonetheless, Sherl stated on numerous occasions that she had recognized the perpetrator as the same man who had been in the campsite earlier in the day.[9] In sum, in the weeks and months after the crime, although Sherl did not recognize photos of defendant, she did maintain that she had recognized him because of the earlier encounter. *Compare State v. Ray*, 157 Or App 601, 605, 971 P2d 490 (1998) (witness identification of perpetrator had sufficient independent source because the witness had interacted with the defendant during earlier encounters and immediately knew who he was).

The third factor discussed in *Classen* is "the certainty expressed by the witness in making that description and in making the subsequent identification[.]" 285 Or at 233. The trial court emphasized Sherl's certainty that the man she had seen earlier in the camp was the man she saw later, after the shooting. Because Sheryl made that assertion on several occasions after the shooting, including to one of the

_____

[9] To the extent that the trial court's conclusion quoted above may suggest that Sherl had identified some distinguishing characteristic concerning defendant's voice or his walk at the time of the crime, we are unable to find support in the record for it. Sherl testified at trial that the voice and walk of the perpetrator seemed familiar to her, but she did not indicate that she recognized them as the same as the voice and walk of the man who had been at the campsite earlier. Rather, she testified that she recognized him by his face.

EMTs who treated her on the night of the shooting, to an investigating detective on August 23, and again to officers on October 1, it is fair to say that, before the in-court identification, she had on multiple occasions asserted that the shooter and the man in the campground were one and the same person. Sherl also indicated at trial that she was certain of her in-court identification of defendant as the perpetrator. Arguably her confidence in her pretrial assertions that she recognized defendant may be somewhat undermined by the fact that she denied, at some points, that she had seen the perpetrator, expressed doubts as to her ability to identify the perpetrator, and identified the helicopter pilot as the perpetrator, as well as her earlier unsuccessful attempts to identify the perpetrator in photo throwdowns. Nonetheless, her certainty, and her opportunity to have seen defendant earlier in the campground, weigh in favor of the identification. *See, e.g.*, *Biggers*, 409 US at 200-01 (victim's expression of "no doubt" as to perpetrator's identity weighed in favor of admission of identification).

The next factor listed in *Classen* is the lapse of time between the original observation and the subsequent identification. *Id.* Here, the suggestive police procedures and in-court identification occurred approximately two years after the crime. Although there is no bright-line rule concerning lapse of time, there is no doubt that a two-year lapse is a significant amount of time and does not weigh in favor of a conclusion that the identification had an independent and reliable source.

Finally, we note that the list of pertinent factors stated in *Classen* is nonexclusive, and one of the factors considered by the United States Supreme Court in *Foster* and later in *Biggers* seems pertinent to our inquiry. In *Foster,* as in the present case, there were several unsuccessful attempts by the witness to make a positive identification. There, the witness failed to make positive identification twice, despite suggestive procedures. 394 US at 443. Here, Sherl failed to make positive identifications twice when shown photo throwdowns with defendant's photos included, and declined to try to identify defendant in a line-up. In this case, however, the initial photo throwdowns were not, in fact, suggestive. Moreover, the record amply demonstrates the reasons why Sherl

was unable to identify defendant from those photo throw-downs; she testified that her physical condition was such that she was unable to make out the details of the pictures.

We conclude that, in the totality of the circumstances, the weighing of the factors in this case leads to a conclusion that the in-court identification had a sufficiently reliable, independent source. Although, as noted, consideration of some of the factors support the identification and some do not, as a whole, we believe that the trial court correctly concluded that the determination of the reliability of Sherl's identification of defendant as the perpetrator of the crimes was properly left to the jury.

In reaching that conclusion, we pause to pay respect to the thoughtful competing analysis that Judge Sercombe has proffered in dissent. As far as appears to us, we and the dissent do not disagree about the evidentiary record in this case, nor do we differ in our understandings of the governing legal principles. Where we part company is over the deliberative, and admittedly difficult, weighing of the reliability of the challenged evidence under the nonexclusive, multi-factorial, methodology that the Supreme Court adopted in *Classen*.

The vagaries of eyewitness identification are well known; the annals of criminal law are laden with examples of mistaken identification. *See Wade*, 388 US at 228. In the years since the United States Supreme Court decided *Manson*, the notion that a witness's certainty in his or her identification of a person as a perpetrator also reflected the witness's accuracy has been "flatly contradicted by well-respected and essentially unchallenged empirical studies." *State v. Long*, 721 P2d 483, 491 (Utah 1986).[10] On the one hand, eyewitness testimony is often believable and can wield considerable influence over jury decisions; on the other hand, eyewitness testimony can be flawed merely owing to the normal and natural memory processes that occur whenever

---

[10] In *Long*, the Utah Supreme Court catalogued a number of scholarly articles on the subject. *See also* Connie Mayer, *Due Process Challenges to Eyewitness Identification Based on Pretrial Photographic Arrays*, 13 Pace L Rev 815 (1994), in which the author reviewed 12 articles or studies on the reliability of eyewitness identification.

human beings acquire, retain, and attempt to retrieve information. Elizabeth Loftus, *Eyewitness Testimony* 7 (1979). "An important body of psychological research undermines the lay intuition that confident memories of salient experiences...are accurate...[T]he mere fact that we remember something with great confidence is not a powerful warrant for thinking it true * * * [A]ccuracy of recollection is *not* highly correlated with the recollector's confidence[.]" *Krist v. Eli Lilly Co.*, 897 F2d 293, 296 (7th Cir 1990) (emphasis in original).[11] Moreover, unless those problems are elucidated at trial, jurors may not be aware of the likelihood or frequency with which misidentifications are made by confident witnesses. *Reed v. State*, 687 NE2d 209, 213 (Ind App 1997).

Having acknowledged those concerns, we observe that the rule adopted in *Classen* and the United States Supreme Court decisions on which it was grounded is unique in its wariness of a jury's ability to weigh conflicting credibility evidence. Neither the latter Court nor the Oregon Supreme Court has extended the trial court's gatekeeper role in determining the reliability of percipient witness testimony for due process purposes beyond the narrow setting of eyewitness identification. *State v. Bumgarner*, 219 Or App 617, 632, 184 P3d 1143 (2008), *rev den,* 345 Or 175, *cert den,* ____ US ____, 129 S Ct 927, *adh'd to as mod on recons*, 229 Or App 92, 209 P3d 857 (2009). The difficulty with extending that role too far even in that narrow setting is that, in the crucible of the adversary process, a jury is usually in no worse position than a judge acting in a gatekeeper's capacity to determine the effect, if any, of improperly suggestive police techniques on the accuracy of eyewitness identification testimony. Thus, short of "a very substantial likelihood of irreparable misidentification," identification evidence is for the jury to weigh. *Manson*, 432 US at 116 ("We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

---

[11] Ironically, eyewitness "certainty" is one of the factors that the court approved for consideration in *Classen*; as discussed, defendant and his expert vigorously challenged its legitimacy at trial in this case.

Here, the accuracy of the challenged identification was hotly contested at trial, and defendant had ample opportunity to controvert it. Any potential for jury adoption of a misidentification was substantially lessened by defense counsel's methodical cross-examination of Sherl and the police investigators, and defendant's expert witness's testimony that vigorously challenged the jury to question the accuracy of the identification. *Simmons v. United States*, 390 US 377, 384, 88 S Ct 967, 19 L Ed 2d 1247 (1968). As an additional safeguard, at defendant's request—and largely in the terms that defendant requested—the trial court extensively instructed the jury with respect to the reliability of eyewitness identification. *See State v. Schroeder*, 55 Or App 932, 938, 640 P2d 688, *rev den*, 293 Or 373 (1982) (stating that, generally, the decision whether to instruct the jury on the reliability of eye witness identification will depend on the trial court's perception of its desirability in each case); *see also Young v. Sirmons*, 486 F3d 655, 666 (10th Cir 2007), *cert den*, 552 US 1203 (2008) (treating the giving of such a cautionary instruction as a factor in the due process analysis). Due process should require no more.

As noted above, we reject defendant's remaining assignments of error. We pause, however, to note that one of them involves a challenge to the trial court's *in camera* inspection of documents to which defendant asserts he was entitled under *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), and we reject that assignment of error after having inspected the documents in question.

Affirmed.

**SERCOMBE, J.,** dissenting.

On appeal, defendant argues that the trial court erred in denying his motion to strike the surviving victim's in-court identification of him because her identification was the product of unduly suggestive police procedures and was not shown to have an independent, reliable source. The state does not dispute that the process leading to the victim's in-court identification was unduly suggestive. As concluded by the majority, that concession is well-taken. *See* 239 Or App at 374. However, I would hold that the state failed to meet its burden to show that there was little likelihood of

misidentification in this case in light of the particular suggestiveness of the prior procedures and the unreliability of the victim's prior identifications of defendant. *See State v. Classen*, 285 Or 221, 232-33, 590 P2d 1198 (1979). Accordingly, I would reverse defendant's convictions and remand the case for a new trial. I respectfully dissent from the majority's conclusions to the contrary.

It is helpful to start with first principles. As explained by the Oregon Supreme Court in *State v. Johanesen*, 319 Or 128, 134, 873 P2d 1065 (1994), the court in *Classen* "fashioned a new evidentiary rule governing the admissibility of * * * identification evidence sought to be excluded by a criminal defendant as a product of an unduly suggestive procedure." The rule derives from the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is "designed to protect the reliability of the verdict, *i.e.*, to minimize the danger of convicting the innocent on the basis of unreliable identification evidence." *Id.* Accordingly, as provided in *Classen*, the ultimate issue to be decided by a court in determining the admissibility of eyewitness identification testimony is whether an identification made following a suggestive procedure has nevertheless "been demonstrated to be reliable despite that suggestiveness." 285 Or at 233 (footnote omitted). Only if the identification survives that *judicial* scrutiny does its reliability and probative force become questions for the jury. *Id.*

*Classen* announces several aspects of the court's role as evidentiary gate-keeper in the setting of eyewitness identification testimony. First, the court's task is to determine whether the process leading to the identification was unduly suggestive and, if so, whether the proffered identification has an independent source or possesses aspects that "substantially exclude the risk that it resulted from the suggestive procedure." *Id.* at 232. Second, in determining whether the evidence is reliable and independent from the suggestive procedures, the court is to consider a nonexclusive list of pertinent factors, which includes the witness's opportunity at the time of the crime to view the perpetrator, the timing and completeness of the witness's description after the event, and the

lapse of time between the original observation and subsequent identification. *Id.* at 232-33. Third, the burden of proving a reliable, independent source rests on the state. *Id.* at 232 ("[T]he prosecution must satisfy the court that 'the proffered identification has a source independent of the suggestive confrontation[.]' "); *State v. Davie*, 56 Or App 507, 513, 642 P2d 680, *rev den*, 293 Or 146 (1982) ("The state bore the burden of proving that the identifications were based on a source independent of the suggestive confrontation.").

As I note above, however, the ultimate issue to be resolved by the court is whether an identification made following a suggestive procedure has nevertheless "been demonstrated to be reliable *despite* that suggestiveness." *Classen*, 285 Or at 233 (emphasis added). Thus, when analyzing the record before it, the court in *Classen* stated, "[T]hese suggestive aspects would not require the court to suppress the evidence that [the witness] had identified defendant's photograph if the prosecution was able *to negate* any substantial risk that this identification was stimulated by the suggestive procedure." *Id.* at 236 (emphasis added). The court, however, was unable to conclude on the record before it that the witness "would have identified one of the photographs out of seven [as the defendant] * * * in the absence of the suggestive procedure." *Id.* at 238. As a result, the court held that the state had failed to carry its burden of proof and the defendant was entitled to a new trial. *Id.*

The ultimate issue identified in *Classen* signals that the gravamen of admissibility of eyewitness identifications— reliability—is determined under the totality of *all* the circumstances, including the effect of any preceding suggestive procedures. In other words, in determining whether to admit the proffered identification, the court must weigh the evidence of reliability (the independent source) against the evidence of suggestive procedure and only where the former overcomes the latter, such that there is not a "substantial risk" of identification based on the suggestive procedure, will the identification be allowed to reach the jury.

That exercise of weighing the evidence of reliability against the evidence of suggestive procedures was explicitly recognized in *Manson v. Brathwaite*, 432 US 98, 97 S Ct

2243, 53 L Ed 2d 140 (1977), a case cited and relied on by the court in *Classen* when formulating the Oregon rule. *See Classen*, 285 Or at 232-33. In *Manson*, the Supreme Court explained:

> "[R]eliability is the linchpin in determining the admissibility of identification testimony * * *. The factors to be considered are set out in [*Neil v. Biggers*, 409 US 188, 199-200, 93 S Ct 375, 34 L Ed 2d 401 (1972)]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Against these factors is to be weighed the corrupting effect of the suggestive identification itself.*"

432 US at 114 (emphasis added). The Supreme Court concluded its analysis, and weighing, of the evidence in *Manson* by stating, "Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' Short of that point, such evidence is for the jury to weigh." *Id.* at 116 (citation omitted).

The concern of the Supreme Court in *Manson* regarding the likelihood of misidentification is echoed in the most recent case issued by this court on this issue: *State v. Ray*, 157 Or App 601, 971 P2d 490 (1998). In *Ray*, we considered the relevant *Classen* factors and determined that the witness's identification "did have a source independent of the suggestive confrontation." *Id.* at 605. In that case, the defendant was charged with second-degree theft, ORS 164.045, based on an alleged unauthorized signing of a credit charge for merchandise at a hardware store. *Id.* at 603. Before the defendant's arrest, the hardware store clerk was brought to the defendant's home to identify the defendant as the person who signed for the charge, a procedure that the state conceded was suggestive of the defendant's identification. *Id.* at 603, 605.

The evidence showed that the clerk had made sales to the defendant in prior encounters over a period of three years, had seen the defendant twice in the company of the victim, had immediately recalled who had signed the slip for

the unauthorized charge on the victim's account, and had remembered the conversation he had had with the defendant at the time of the sale. *Id.* at 605. We stated that the witness "had ample opportunity to view defendant and to determine that he knew him from past encounters." *Id.* Accordingly, after considering "the totality of the circumstances," we found that the witness "possessed 'knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from [his] observations of him at the time of the crime.' Given [the witness's] familiarity with defendant, *there was little likelihood of misidentification in this case.*" *Id.* (first bracketed text in *Ray*; citation omitted; emphasis added).

Returning to the instant case, in order for the state to have met its burden to demonstrate a sufficiently reliable, independent source for Sherl's in-court identification of defendant, the state needed to adduce evidence that negated the corrupting effect of the suggestive identification procedures used by law enforcement officers prior to trial.[1] Where,

_____

[1] It is worth noting that other courts, when discussing the state's burden to prove a source of the identification independent from the suggestive procedure, have described that burden as one of presenting "clear and convincing evidence." *See, e.g., United States v. Wade*, 388 US 218, 240, 87 S Ct 1926, 18 L Ed 2d 1149 (1967) (where a lineup identification is made in the absence of a defendant's counsel, the exclusion from evidence of subsequent in-court identifications is justified only where the government is given "the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification"); *United States v. Sanders*, 479 F2d 1193, 1198 (DC Cir 1973) ("identifying evidence by the witnesses * * * would be admissible only upon clear and convincing evidence adduced by the government that their respective in-court identifications would rest upon a source independent of the identifying procedures we have held to have been impermissibly suggestive"); *Commonwealth v. Botelho*, 369 Mass 860, 867-68, 343 NE2d 876 (1976) (if the defendant sustains his burden to prove by a preponderance that a given confrontation was unnecessarily suggestive, "then, should the prosecution desire to offer identification testimony, it must assume the burden of establishing by 'clear and convincing evidence' that the proffered identification has a source independent of the suggestive confrontation"). Both *Sanders* and *Botelho* are cited by the Oregon Supreme Court in formulating the Oregon rule. *See Classen*, 285 Or at 232, 233 n 8.

It is unclear whether requiring the state to surmount a heightened evidentiary hurdle—that of clear and convincing evidence—survives where the court is also tasked with weighing evidence of the reliability of the in-court identification against the preceding suggestive procedures. It may be that the necessary showing must be clear and convincing in order to overcome the taint of prior suggestive procedures in all cases.

as here, the pretrial identification procedures used by those officers are particularly suggestive, proof of the independent reliability of Sherl's prior identifications of defendant must be correspondingly stronger in order to overcome that taint. In determining whether the state has met its burden, I begin by considering the evidence of the suggestive identification procedures used in this case and then weigh that proof against evidence that relates to the *Classen* factors of reliability, in order to determine if there is little likelihood of misidentification in this case.

## I.  EVIDENCE OF SUGGESTIVE PROCEDURES

As recounted by the majority, Sherl failed to identify defendant in photograph arrays shown to her by police detectives in the months immediately following the crime. Two years later, in preparing for trial, police officers renewed efforts to obtain that identification evidence. The trial court concluded that two suggestive pretrial procedures occurred in this case: "the personal view of the defendant in court followed by a display of a single photograph of the defendant." In its findings of fact, the trial court described the occurrence of those procedures this way:

> "In September 2005, Sherl Hilde attended a pre-trial hearing in this case in the company of Officer Merrifield. The defendant was seated at counsel table, and apparently [Sherl] was able to see at least a portion of the defendant's face from her seat in the back of the courtroom. Thereafter, Officer Merrifield provided [Sherl] with a single photograph of the defendant—a photograph that was taken by officers in August 2003, showing the defendant wearing a dark shirt and a dark hat with white lettering."

Detective Merrifield explained why he elected to show defendant to Sherl in court:

> "She was very fearful of having to face the man who murdered her husband and shot her for the first time after this

---

In this case, I need not decide whether proof by clear and convincing evidence is required to prove an independent source for the in-court identification, because even without the heightened evidentiary hurdle, I ultimately conclude, under the lesser preponderance hurdle, that the state failed to meet its burden of presenting sufficient evidence to negate the substantial risk of misidentification as a result of the unduly suggestive pretrial procedures.

incident happened, and I was concerned for her because she was so scared of this. And we, between the two of us, came up with [this] to try to allow her to see him in the courtroom, and that was the reason for bringing her up to the courtroom just to let her see him. That he is a man like any of us. That he's—that this would help her in the process of having to get up and do this in front of people that she doesn't know and relive this incident again."

The timing of the two suggestive procedures— approximately two months before the in-court identification and two years after the crimes—weighs heavily in favor of a substantial risk of misidentification. Although our prior case law has generally addressed suggestive on-the-scene identification procedures, *see, e.g.*, *Davie*, 56 Or App at 510-11, 513, and suggestive photographic identification procedures, *see, e.g.*, *State v. Najibi*, 150 Or App 194, 197-98, 945 P2d 1093 (1997), *rev den*, 326 Or 464 (1998), the initial suggestive procedure involved in this case—the viewing of defendant at the pretrial hearing—carries with it an especially corrupting effect on future in-court identifications. Given the courtroom setting at the pretrial hearing, Sherl's viewing of defendant at that time was essentially a dress rehearsal for her in-court identification two months later, something that "would help her in the process of having to get up and do this in front of people" at trial. The evidence regarding the suggestive procedures therefore indicates a very substantial risk of misidentification. The issue becomes, then, whether there is a reliable and independent source for that identification that is sufficient to overcome the substantial risk of misidentification caused by the suggestive procedures. That determination is made using the *Classen* factors.

## II.   EVIDENCE RELEVANT TO THE *CLASSEN* FACTORS

### A.   *Opportunity to view the perpetrator*

The first *Classen* factor is "the opportunity that the witness had at the time to get a clear view of the persons involved in the crime." 285 Or at 232. The trial court made the following findings regarding Sherl's opportunity to view the person at the time of the crime: (1) after she and her husband were shot, Sherl "was on her back on the floor" of the

trailer; (2) a " 'man' asked [Sherl] if she had seen him, and [Sherl] indicated that she had not seen him. The man put a pillow over her face to block her view"; and (3) Sherl "decided to turn her head so she might view the person. Thereafter, the 'man' walked by the doorway of the trailer, and in the light that came from inside the trailer, she saw the man's profile as he stopped for a brief time."

Other evidence in the record is also relevant to the first factor. The majority notes that

"[t]he observation occurred some time after 10:00 p.m. in a trailer that either was unlit or was dimly lit; * * * Sherl was observing the man covertly, because he had put a pillow over her face to prevent her from seeing him; * * * at the time she saw him, she was suffering from a painful and indeed life-threatening gunshot wound."

239 Or App at 381.

Sherl's opportunity to view the perpetrator at the time of the shootings differs significantly from the quality of the viewings that other witnesses have had in other cases where we have upheld identifications notwithstanding suggestive identification procedures used by the state. *See, e.g.,* *Najibi*, 150 Or App at 196, 199 (although the two witnesses' view of a robbery suspect's facial features was restricted by head gear that left only the area around his eyes visible, the witnesses got a clear view of the suspect during daylight and during their substantial contact with him at the time of the crime); *State v. Morgan*, 80 Or App 747, 749, 724 P2d 334, *rev den*, 302 Or 461 (1986) (the victim saw the suspect's face for about one minute from two to three feet away as it was lit by a pole lamp in a parking lot and her car's interior light); *Davie*, 56 Or App at 509 (one witness, awakened from sleep by a nighttime intruder whose hand was on her leg, saw the man in light that entered her bedroom from the kitchen through a partly open door, and a second witness, already awake in an adjoining bedroom, saw the man take two or three steps into her bedroom in "very good light" coming in from the kitchen and by moonlight coming in from the living room windows and bedroom windows, which had no curtains). As many of the circumstances surrounding Sherl's opportunity to view the perpetrator counsel against reliability

—the absence of good lighting, the limited scope and duration of the viewing, and the effects of Sherl's injury—the evidence under this factor adds little to the scale to negate the suggestiveness of the pretrial procedures.

B.  *Timing and completeness of the witness's description*

The second *Classen* factor is "the timing and completeness of the description given by the witness after the event." *Id.* at 232-33. The trial court made the following findings regarding the timing and completeness of Sherl's descriptions of the perpetrator of the August 21, 2003, shootings: (1) on August 23, 2003, "[Sherl] communicated that she and her husband had been shot by a single person—that she could identify—who drove a yellow pickup"; (2) on September 22, 2003, "[Sherl] * * * asserted that the 'man' that did the shooting was wearing the same hat and shirt as the 'man' who was in their camp earlier in the day"; and (3) on October 1, 2003, "Sherl Hilde provided additional details of the events of August 21, including a description of the man as a taller person wearing a baseball cap and dark colored shirt. She related that she had not seen the full face of the person, but that she had seen his profile."

Other evidence in the record is also relevant to the second factor. The majority describes much of that evidence in detail. *See* 239 Or App at 382-83. Because I find this factor to be particularly important to the analysis at hand, however, I pause to reiterate the evidence described by the majority and to note other relevant considerations.

When the first responders arrived on the scene on August 21, 2003, Sherl indicated to an EMT that she did not know who had shot her or her husband. She was loaded into the back of an ambulance and given only oxygen; no narcotics were administered at that time. The ambulance left the scene and drove to a highway, where Deputy Mapes arrived and, at some point, briefly interviewed Sherl. She was in a lot of pain and it was difficult for her to talk, but she told Mapes that the subject was wearing a black baseball cap with white lettering on it and a black T-shirt and that he was slender. Sherl never told Mapes that the person who had shot her was the person she had seen earlier in the day in the campsite. At some point, Sherl was transferred to a second ambulance, where

she told another first responder, Morgan, that the person's cap and shirt were a dark color and that she had seen him earlier in the day at the campground. Sherl was subsequently transferred to a helicopter, were she told the respiratory therapist, Jennings, that she had been shot by a young man and that he was driving a yellow truck. Sherl also indicated that the person who shot her was somebody she either knew or had contact with prior to the shooting. The conversation between Jennings and Sherl occurred before she was given narcotics in flight. At some point on the way to the hospital or shortly after she arrived, Sherl stated a belief that the helicopter pilot was the perpetrator.

On August 23, 2003, Sherl communicated to Sergeant Kipp, through leading questions, that she had seen the man who had shot her and her husband, that there was one person who had committed the crime, and that he was wearing a baseball cap and a shirt. Sherl indicated that earlier in the day, before the crime was committed, she had seen the person who shot her and that it was the person who had stayed in their tent at their campground. She further indicated that the suspect had not driven a vehicle into the campground when the crime was committed, but that she had seen the shooter's vehicle earlier in the day and it was a yellow pickup. During the interview, Kipp attempted to have Sherl identify the suspect through a photo lineup, but she could not do so.

On September 22, 2003, during an interview with Detective Merrifield, Sherl described the man who shot her as wearing the same dark-colored baseball cap with white lettering and dark-colored shirt as the man who was in their camp earlier in the day. Merrifield attempted to have Sherl identify the suspect in a second photo array, but, again, she could not do so. Sherl was also shown a photo of defendant's truck, and indicated that the truck in the photo was like the truck the man had in the camp earlier in the day.

On October 1, 2003, in yet another interview, Sherl again indicated that the perpetrator was the man from the camp earlier in the day—that the man was wearing a baseball cap like the one worn by the man earlier in the day, that the man had a thin build like the man from earlier in the day,

and that he was wearing a dark-colored shirt like the man was wearing earlier in the day. In addition, Sherl stated that, as she lay on the ground and the man walked by, she could see that his shoulders cleared the bottom of the trailer, whose height Noris had raised, so that she believed him to be a taller person. She told Merrifield that she was not sure if the man was wearing pants or shorts but thought that he was wearing jeans. She also described the man's voice as being soft when he talked to her the final time.

In sum, Sherl's description of the perpetrator's shirt, cap, and build were consistent, but generic—a dark or black T-shirt, a dark or black baseball cap with white lettering, and a thin or slender build. She offered little else by way of a *description*—just that the perpetrator was a young man, a taller person, a person with a soft voice, and a person who may have been wearing jeans. None of those descriptions was of specific features, such as eye, hair, or skin color, much less distinguishing characteristics, such as scars or tattoos. In addition, Sherl's identification of the perpetrator through *correlation* to other individuals varied from indicating that the perpetrator was the man from the campsite earlier in the day to the perpetrator was the helicopter pilot, although she appears to have correlated the perpetrator on most occasions to the person in the campsite earlier in the day. In addition, Sherl was unable to identify defendant in the two photo throwdowns shown to her in the month following the shootings.

In those respects, this case again differs significantly from a number of the cases in which we upheld the independent reliability of identifications. *See, e.g.*, *Najibi*, 150 Or App at 196 (the witnesses described three robbers as having light complexions and one robber as having a dark olive complexion, being five feet eight or nine inches tall, 150 to 160 pounds, with brown eyes and dark brown hair tied in a short pony tail); *State v. Mackey*, 86 Or App 691, 694, 740 P2d 231, *rev den*, 304 Or 279 (1987) (the witness noted the robbery suspect's facial scar, arm tattoo, light bearding, light reddish-blond hair, and type and color of clothing); *Davie*, 56 Or App at 509-10 (although neither witness was able to describe facial features of the intruder, the witnesses described him as being about six feet tall, 160 to 180 pounds, with blond,

shoulder-length hair, in his early twenties, and wearing a red or red and white baseball cap, a white T-shirt, Levi's, and a heavy dark jacket). Although Sherl provided a description of the perpetrator on multiple occasions relatively soon after the crimes, the generalness and variations in her descriptions counsel against reliability; the evidence under this factor again adds little to the scale to negate the suggestiveness of the pretrial procedures.

## C.  *Certainty of the witness*

The third *Classen* factor is "the certainty expressed by the witness in that description and in making the subsequent identification." 285 Or at 233. The trial court noted that, in making the in-court identification of defendant as the shooter, Sherl expressed that she did not have any doubts, that she would never forget his face, and that she always knew that the shooter was defendant. The trial court also noted that Sherl was "certain that the 'man' that was in their camp site on the morning of August 21, 2003, is the same 'man' that shot her husband and herself later that evening."

As with the preceding factors, however, other evidence in the record is relevant here. The majority notes some of that evidence: "[Sherl] denied, at some points, that she had seen the perpetrator, expressed doubts as to her ability to identify the perpetrator, and identified the helicopter pilot as the perpetrator, as well as her earlier unsuccessful attempts to identify the perpetrator in photo throwdowns." 239 Or App at 384. In addition, I also add to those considerations the circumstances of Sherl's encounter with the man in her campsite earlier in the day, *i.e.*, the source of her certainty that the perpetrator of the shootings was that man. The trial court found:

> "[Sherl] had a period of approximately 40 minutes to observe the defendant at Briggs Camp on the morning of August 21, 2003. She described him as a 'nice looking, clean cut' man with a thin mustache, who appeared 'depressed.' She was several steps behind Noris Hilde when her husband talked to the defendant and heard the defendant's voice and saw his face. [Sherl] was curious about the defendant's demeanor (she described him as 'nonchalant') and remembered the manner in which defendant moved (which

she characterized as a 'loping walk'). [Sherl] recalled that the defendant was wearing a dark or black shirt and a black hat that had white lettering. [Sherl] paid particular attention to the defendant because the circumstances made her feel uneasy, and she was relieved when he left the campground."

Unlike in *Ray,* where the witness had made sales to the defendant in multiple prior encounters over a period of three years, *see* 157 Or App at 605, Sherl's prior encounter with defendant was limited to one instance over the span of 40 minutes. During that encounter, however, she noted some of defendant's physical attributes and his clothing. Her description of defendant from the morning of August 21 matches, in many respects, her later descriptions of the perpetrator of the shootings; although one of the more identifying features of defendant from earlier in the day—his thin mustache—is not part of the descriptions Sherl gave of the perpetrator. On balance, Sherl's opportunity to observe the man in her campsite earlier in the day and her generally consistent certainty that that man was the perpetrator of the shootings counsel in favor of reliability, adding more evidence to the scale to negate the suggestiveness of the pretrial procedures.

### D. *Lapse of time*

The next *Classen* factor is the lapse of time between the original observation at the time of the crime and the subsequent identification sought to be admissible. *See* 285 Or at 233. Sherl's original observation of the person involved in the shootings occurred on August 21, 2003; she identified defendant as the perpetrator of those crimes at trial on November 4, 2005. As noted by the majority, "there is no doubt that a two-year lapse is a significant amount of time and does not weigh in favor of a conclusion that the identification had an independent and reliable source." 239 Or App at 384. The two-year lapse of time between the original observation and in-court identification, in my opinion, fails to add any measure of weight to the scale to negate the suggestiveness of the pretrial procedures.

Considered in their entirety, the above circumstances indicate that there is a source for Sherl's in-court

identification that is separate from the pretrial suggestive procedures. That source, however, bears limited indicia of reliability.

## III. CONCLUSIONS

Under the totality of all the circumstances, I cannot conclude that the prosecution, in this case, presented sufficient evidence under the *Classen* factors to negate the very substantial risk of misidentification precipitated by the suggestive procedures. In weighing the competing factors, I acknowledge that this case is a close one. However, when evidence of Sherl's limited opportunity to view the perpetrator is combined with her generic descriptions of the perpetrator, her certainty of her correlation that the perpetrator was the man from earlier in the day, and the two-year lapse of time, I am persuaded that that evidence fails to demonstrate that Sherl's in-court identification is reliable *despite* the suggestive pretrial procedures. Because I would hold that the state failed to meet its burden of proof, I conclude that the trial court erred in denying defendant's motion to exclude Sherl's in-court identification of defendant as the perpetrator of the crimes.